**[Cite as *State v. Sanders*, 2025-Ohio-411.]**

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. Craig R. Baldwin, P.J. |
|  | : | Hon. Michael D. Hess, V. J. |
| Plaintiff-Appellee | : | Hon. Jason P. Smith, V.J. |
|  | : |  |
| -vs- | : | Judge Hess and Judge Smith |
|  | : | Sitting by Assignment of the |
| CHARLIE SANDERS | : | Supreme Court of Ohio |
|  | : |  |
| Defendant-Appellant | : | Case No. 24 CAA 06 0037 |
|  | : |  |
|  | : |  |
|  | : | <u>OPINION</u> |

CHARACTER OF PROCEEDING:      Appeal from the Delaware County Court of
Common Pleas, Case No. 23 CRI 090569

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      February 7, 2025

APPEARANCES:

For Plaintiff-Appellee

MELISSA A. SCHIFFEL
Prosecuting Attorney
BY: KATHERINR L. MUNGER
Assistant Prosecutor

For Defendant-Appellant

APRIL F. CAMPBELL
Campbell Law, LLC
545 Metro Place S., Ste. 100
Dublin, OH 43017

*Hess, V.J.,*

{¶1}    Defendant-appellant Charlie Sanders ["Sanders"] appeals his conviction for one count of Tampering with Evidence after a jury trial in the Delaware County Court of Common Pleas.

### Facts and Procedural History

{¶2}    On September 28, 2023, the Delaware County Grand Jury indicted Sanders and his co-defendant Holly L. Smith  on one count of Tampering With Evidence a felony of the third degree in violation of R.C. 2921.12(A)(1)/2921.12(B), and Sanders with one count of Aggravated Possession of Drugs, methamphetamine, 5 times bulk amount, a felony of the second degree in violation of R.C. 2925.11(A) / 2925.11(C)(1)(c).   Count Three of the Indictment charged Ms. Smith with one count of Aggravated Possession of Drugs.

{¶3}    On January 18, 2024, Sanders filed a Motion to Dismiss / Suppress; Motion for Findings of Fact pursuant to Crim.R. 12(E). The state filed a memorandum contra on January 31, 2024. The trial judge held an evidentiary hearing on the motion on February 15, 2024. The trial judge overruled the motion by Judgement Entry filed February 21, 2024.

{¶4}    A jury trial was held in Sanders' case on April 12, 2024. The jury found Sanders guilty of Tampering with Evidence and Not Guilty of Aggravated Possession of Drugs. The trial judge sentenced Sanders to 24 months in prison with credit for time served.

### *A concerned citizen alerts police to a suspicious vehicle/persons*

{¶5}   On July 24, 2023 at around 2:30 a.m., deputies with the Delaware County Sheriff's Office were called out to St. Joan of Arc Church in Powell, Ohio on a report of a suspicious vehicle or persons in the rear church parking lot.

*Law enforcement responds to the scene*

{¶6}   Upon arrival, deputies observed a male and female moving around a suitcase or backpack outside of a car parked beside a utility shed behind the church. Multiple doors to the car were open. When Sanders noticed deputies entering the area with their patrol cruiser, he quickly walked around the car and closed all the doors. As the deputies exited their cruiser, they yelled for the individuals to "stop." Supp.T. at 26; 60[1]. The entire encounter was recorded by the deputies body cameras.

*The investigation*

{¶7}   Sanders asked if he was being detained and whether he was being accused of doing something illegal by being in the parking lot. He told the deputies that he did not see a no trespassing sign; however, if he was not allowed to be there at that time, he would leave, if asked. Supp. T. at 33.   The deputies asked for identification. Sanders told the deputy that he did not have one, and that he should not have to identify himself. Supp.T. at 33. Sanders told the deputies that he had just arrived back from Arkansas, and that he had got a ride to near where his mother lived. The female was able to produce a valid Ohio driver's license.

{¶8}   One of the deputies saw a temporary registration tag in the vehicle's window and radioed the sheriff's office dispatcher to request information about the vehicle and its owner. When Deputy Doudna heard his colleague say aloud to the dispatcher the

---

[1] The transcript of the hearing on Sandres' motion to suppress will be referred to as, "Supp.T."

letters and numbers on the temporary tag, Doudna's suspicions "were further aroused because the format of those numbers and letters did not match the standard format for temporary tags in Ohio."

{¶9} The dispatcher then radioed that the name associated with the temporary-tag number in the vehicle's window was "Rodney Ferguson." The dispatcher noted the expiration date associated with the tag. That date in official motor-vehicle records checked by the dispatcher did not match the date visible on the temporary tag displayed in the vehicle's window. Sanders told the deputies that the car was owned by Rodney Ferguson.

*Sanders is placed in the backseat of a deputy's cruiser*

{¶10} In order to hold separate conversations with the two persons, the deputies separated Sanders from Ms. Smith, by placing Sanders in the backseat of one of the patrol cruisers on the scene. Supp. T. at 19. Before placing him in the cruiser, Deputy Doudna asked Sanders if he had any weapons on his person. Supp. T. at 37. Sanders noted that he had a butane lighter, or torch, which he handed to the deputy. Id.

{¶11} Meanwhile, one of the deputies, while standing outside the vehicle and looking through a window into it, saw a digital scale in the backseat. When a deputy inquired about that scale, Ms. Smith responded that she was a coin collector and that she used the scale to weigh coins. A deputy also saw in the vehicle some burnt foil with some black residue on it that was visible through a window of the vehicle. That item was in the passenger area of the front seat on top of a purple bag.

**{¶12}** A deputy asked the female, "Are you driving, or is he?" Shrugging, the female said "um." She denied being the owner of the purple bag in the vehicle or any burnt foil on top of it when a deputy asked her about those items. She did say that she had a broken knife in the vehicle that she wraps in foil, and she claimed that might be what the deputy had observed. The deputies questioned Ms. Smith and, as they attempted to pat her down, she attempted to ingest something. Suspecting it to be narcotics, paramedics were called to the scene in case the female were to have overdosed.

*Sanders tells the deputies he cannot unlock the car*

**{¶13}** Sanders denied to the deputies that he had any means to enter the locked car. 2T. at 184[2]. A neighboring police department was called to assist in gaining access to the inside of the car. Id.; State's Trial Exhibit 12.

*The search of the car and the luggage, bags and back packs*

**{¶14}** After the vehicle was unlocked with a police lockout kit, deputies searched it and located a ball of aluminum foil with what appeared to be a burn spot on it and , from the center console, a cup with a clear crystal substance inside. 2T. at 153; 189. Inside the driver's side door a plastic bag with a crystal substance in it was recovered. Id. at 288. Two meth pipes, a folded piece of paper with a white substance in it and other drug paraphernalia were also recovered. Id. State's Trial Exhibt 15. Inside a purple bag there was the co-defendant's identification. Digital scales were also removed by the deputy. 2T. at 190.

---

[2] For clarity, the transcript of Sanders' jury trial will be referred to as "__T.__" signifying the volume and page number.

{¶15} Upon searching Sanders' backpack that was outside the car, deputies discovered three small unlabeled tan/brown pills that were not controlled substances. 2T. at 189. No contraband was found inside Sanders' luggage. Supp. T. at 42.

{¶16} While in the back seat of a cruiser, Sanders can be seen on camera manipulating an item in his pocket and then can be heard making a snorting noise. 2T. at 183; State's Trial Exhibit 5. When deputies searched the cruiser the following day, they found a key wedged in between the foam padding and the cage. Id. The key was to the car that Sanders and the female were near, and that the deputies had searched, in the church parking lot. Id. at 183-184.

{¶17} Ms. Smith was arrested and the car was impounded; however, Sanders was allowed to gather his belongings and was released from the scene. 2T. at 192; 199. Later, on July 27, 2023, Sanders presented a vehicle registration, power of attorney, and a state identification card and the car was released from impound to him. 2T. at 226-227.

{¶18} The jury found Sanders guilty of Tampering with Evidence and Not Guilty of Aggravated Possession of Drugs.

*Assignments of Error*

{¶19} Sanders raises two Assignments of Error,

{¶20} "I. SANDERS WAS UNLAWFULLY SEIZED AND THEN DETAINED IN THE BACK SEAT OF THE OFFICER'S CRUISER UNDER THE FOURTH AMENDMENT AND THE OHIO CONSTITUTION. THE EVIDENCE RESULTING FROM THAT SEIZURE MUST BE SUPPRESSED.

**{¶21}** "II. BECAUSE THE INDICTMENT WAS DEFECTIVE ON THE TAMPERING WITH EVIDENCE COUNT SANDERS WAS INDICTED WITH FOR ITS DUPLICITY, SANDERS'S CONVICTION SHOULD BE REVERSED."

I.

**{¶22}** In his First Assignment of Error, Sanders contends that the trial judge erred in denying his motion to suppress because he was unlawfully detained when the deputy placed him in the back of the patrol car.

### Standard of Appellate Review

**{¶23}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate witness credibility. See *State v. Dunlap*, 1995-Ohio-243; *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). Accordingly, a reviewing court must defer to the trial court's factual findings if competent, credible evidence exists to support those findings. See *Burnside,* supra; *Dunlap,* supra; *State v. Long*, 127 Ohio App.3d 328, 332 (4th Dist. 1998); *State v. Medcalf*, 111 Ohio App.3d 142 (4th Dist. 1996). However, once this Court has accepted those facts as true, it must independently determine as a matter of law whether the trial court met the applicable legal standard. See *Burnside,* supra, citing *State v. McNamara*, 124 Ohio App.3d 706(4th Dist. 1997); See, generally, *United States v. Arvizu*, 534 U.S. 266(2002); *Ornelas v. United States*, 517 U.S. 690(1996). That is, the application of the law to the trial court's findings of fact is subject to a *de novo* standard of review *Ornelas*, supra. Moreover, due weight should be given "to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas*, supra at 698.

**Issue for Appellate Review**: *Whether the trial judge erred in finding that*

*Sanders was not unlawfully detained.*

{¶24}  Contact between police officers and the public can be characterized in three different ways. *State v. Richardson,* 2005-Ohio-554 at ¶ 23-27 (5th Dist.). The first is contact initiated by a police officer for purposes of investigation. "[M]erely approaching an individual on the street or in another public place [,]" seeking to ask questions for voluntary, uncoerced responses, does not violate the Fourth Amendment. *United States v. Flowers*, 909 F.2d 145, 147 (6th Cir. 1990). The United State Supreme Court "[has] held repeatedly that mere police questioning does not constitute a seizure."  *Florida v. Bostick,* 501 U.S. 429, 434; *see also INS v. Delgado,* 466 U.S. 210, 212 (1984). "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage." *Bostick,* supra*,* at 434-435(citations omitted). The person approached, however, need not answer any question put to him, and may continue on his way. *Florida v. Royer*, 460 U.S. 491, 497-98 (1983). Moreover, he may not be detained even momentarily for his refusal to listen or answer." Id.

{¶25}  The second type of contact is generally referred to as "a *Terry* stop" and is predicated upon reasonable suspicion. *Richardson,* supra*; Flowers,* 909 F.2d at 147; *See Terry v. Ohio*, 392 U.S. 1(1968). This temporary detention, although a seizure, does not violate the Fourth Amendment. Under the *Terry* doctrine, "certain seizures are justifiable ... if there is articulable suspicion that a person has committed or is about to commit a crime." *Florida v. Royer,* 460 U.S. 491, 498(1983). In holding that the police officer's

actions were reasonable under the Fourth Amendment, Justice Rehnquist provided the following discussion of the holding in *Terry:* "

> In *Terry* this Court recognized that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams*, 407 U.S. 143, 145-47(1972).

{¶26} The Fourth Amendment further requires that officers have had a "reasonable fear for his own or others' safety" before frisking. *Terry v. Ohio*, 392 U.S. 1, 30(1968). Specifically, "[t]he officer ... must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (*quoting Terry,* 392 U.S. at 27.). Whether that standard is met must be determined "'from the standpoint of an objectively reasonable police officer,'" without reference to "the actual motivations of the individual officers involved." *United States v. Hill*,131 F.3d 1056, 1059 (D.C. Cir. 1997), (*quoting Ornelas v. United States*, 517 U.S. 690, 696(1996)).

{¶27} The third type of contact arises when an officer has "probable cause to believe a crime has been committed and the person stopped committed it." *Richardson,* supra*; Flowers,* 909 F.2d at 147. A warrantless arrest is constitutionally valid if: "[a]t the moment the arrest was made, the officers had probable cause to make it-whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the * * * [individual] had committed or was committing an offense." *State v. Heston*, 29 Ohio St.2d 152, 155-156(1972), *quoting Beck v. Ohio,* 379 U.S. 89, 91(1964). "The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Ornelas v. United States*, 517 U.S. 690, 696(1996). A police officer may draw inferences based on his own experience in deciding whether probable cause exists. *See, e.g., United States v. Ortiz* 422 U.S. 891, 897(1975).

{¶28} In *Florida v. Bostick*, 501 U.S. 429 (1991), the United States Supreme Court reiterated that,

> [A] consensual encounter does not trigger Fourth Amendment scrutiny. See *Terry v. Ohio,* 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L. Ed.2d 889. Even when officers have no basis for suspecting a particular individual, they may generally ask the individual questions, *Florida v. Rodriguez,* 469 U.S. 1, 5-6, 105 S.Ct. 308, 310-311, 83 L.Ed.2d 165, ask to examine identification, *INS v. Delgado,* 466 U.S. 210, 216, 104

S.Ct. 1758, 1762-1763, 80 L.Ed.2d 247, and request consent to search

luggage, *Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75

L.Ed.2d 229, provided they do not convey a message that compliance with

their requests is required.

**{¶29}**  501 U.S. at 434-35. The courts in Ohio have taken a similar approach:

Because the vehicle was parked, appellant was not subjected to a

seizure *per se* as happens when a motorist is stopped in transit by a police

officer. Numerous Ohio courts ... have held that a police approach and

encounter with a stationary vehicle is consensual in nature, thereby making

the Fourth Amendment inapplicable. See, e.g*., State v. Welz* (Dec. 9, 1994),

Lake App. No. 93-L-137, unreported; *Cuyahoga Falls v. Sandstrom* (June

21, 1995), Summit App. No. 17000, unreported; *State v. Kiggans* (Nov. 20,

1995), Stark App. No. 1995CA00157, unreported; *State v. Osborne* (Dec.

13, 1995), Montgomery App. No. CA 15151, unreported.

*State v. Lott*, 1997 WL 799426 (11th Dist. Dec. 26, 1997) at *5.

**{¶30}**  In the instant case, the deputies yelled for Sanders to "stop" as they were exiting their cruiser. They further indicated that Sanders was not free to leave and would be charged with "Obstructing" if he did not provide his identification.  Thus, the situation in this case was not a consensual encounter; nor, did the deputies testify to anything approaching probable cause to believe Sanders had, or was about to, commit a crime. Therefore, we find the stop in this case is most closely analogous to a "*Terry*" stop, for which the deputies need a reasonable suspicion that Sanders or the young lady, has committed or is about to commit a crime.

*The "tip"*

**{¶31}** In order to determine if the deputies had a reasonable suspicion to stop Sanders, we must determine whether the information conveyed to the deputies was sufficient to provide a reasonable and articulable suspicion.

**{¶32}** The courts have recognized three categories of informants: (1) citizen informants; (2) known informants, i.e., those from the criminal world who have previously provided reliable tips; and (3) anonymous informants, who are comparatively unreliable. *Maumee v. Weisner*, 87 Ohio St.3d 295, 300.

**{¶33}** In *Weisner*, the Ohio Supreme Court discussed the credibility to be given to an identified citizen tipster:

> The [United States Supreme Court] has further suggested that an identified citizen informant may be highly reliable and, therefore, a strong showing as to the other indicia of reliability may be unnecessary: '[I]f an unquestionably honest citizen comes forward with a report of criminal activity-which if fabricated would subject him to criminal liability-we have found rigorous scrutiny of the basis of his knowledge unnecessary.' *Illinois v. Gates*, 462 U.S. at 233–234, 103 S.Ct. at 2329–2330, 76 L.Ed.2d at 545.

> In light of these principles, federal courts have routinely credited the identified citizen informant with greater reliability. In *United States v. Pasquarille* (C.A.6, 1994), 20 F .3d 682, 689, for instance, the Sixth Circuit presumed the report of a citizen informant to be reliable because it was based on firsthand observations as opposed to " 'idle rumor or irresponsible conjecture," ' *quoting United States v. Phillips* (C.A.5, 1984), 727 F.2d 392,

397. Likewise, the Tenth Circuit has held that the statement of an ordinary citizen witness is entitled to more credence than that of a known informant." ' Courts are much more concerned with veracity when the source of the information is an informant from the criminal milieu rather than an average citizen * * * in the position of a crime * * * witness." ' *Easton v. Boulder* (C.A.10, 1985), 776 F.2d 1441, 1449, *quoting LaFave, Search and Seizure* (1978) 586–587. *See, also, Edwards v. Cabrera* (C.A.7, 1995), 58 F.3d 290, 294.

Many Ohio appellate courts have also accorded the identified citizen witness higher credibility ... In *State v. Loop* (Mar. 14, 1994), Scioto App. No. 93CA2153, 1994 WL 88041 ... the court held that a telephone call from a citizen stating that a motorist might be having a seizure was sufficient to justify an investigative stop that produced evidence of drunken driving. The court reasoned that " '[i]nformation from an ordinary citizen who has personally observed what appears to be criminal conduct carries with it indicia of reliability and is presumed to be reliable." ' Id. at 5, *quoting State v. Carstensen* (Dec. 18, 1991), Miami App. No. 91–CA–13, *301 at *4, 1991 WL 270665 .... *See, also, Fairborn v. Adamson* (Nov. 17, 1987), Greene App. No. 87–CA–13, at 4–5, 1987 WL 20264; *State v. Jackson* (Mar. 4, 1999), Montgomery App. No. 17226, at *5, 1999 WL 115010, observing generally that " 'a tip from an identified citizen informant who is a victim or witnesses a crime is presumed reliable, particularly if the citizen relates his

or her basis of knowledge,'" *quoting Centerville v. Gress* (June 19, 1998), Montgomery App. No. 16899, at *4–5, 1998 WL 321014."

*Weisner*, 87 Ohio St.3d at 300–301.

**{¶34}** The case at bar concerns a citizen's tip. In *Maumee*, the Ohio Supreme Court cautioned,

> We emphasize that our categorization of the informant as an identified citizen informant does not itself determine the outcome of this case. Instead it is one element of our totality of the circumstances review of this informant's tip, weighing in favor of the informant's reliability and veracity.

87 Ohio St.3d at 302.

**{¶35}** The Court in *Maumee*, considered the motivation of the tipster as a factor for the Court to consider in determining the reliability of the tip,

> We also believe that the informant's motivation supports the reliability of his tip. According to the evidence, the informant reported that Weisner was weaving all over the road. He made this report from the perspective of a motorist sharing the road with another motorist driving erratically. We can reasonably infer from these circumstances that he considered Weisner a threat to him personally as well as to other motorists and that he was motivated, therefore, not by dishonest and questionable goals, but by his desire to eliminate a risk to the public's safety.

87 Ohio St.3d at 302.

{¶36}  In the case at bar, upon their arrival on the scene, the deputies were able to confirm a car matching the description given by the caller, and two individuals, moving bags and luggage around. Upon making eye contact, Sanders quickly moved around the car, closing all the doors. The hour was around 2:00a.m., the encounter occurred in the rear church parking lot, and, the circumstances were enough to arouse the concerns of a citizen and to motivate a concerned citizen to report the situation to the police.

{¶37}  The Ohio Supreme Court has held that a police officer's statement "Hey, come here a minute," while nominally couched in the form of a demand, is actually a request that a citizen is free to regard or to disregard. *State v. Smith*, 45 Ohio St.3d 255, 258–259(1989), *reversed sub nom. Smith v. Ohio*, 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464(1990)[3]; *State v. Crossen*, 2011-Ohio-2509, ¶13 (5th Dist.).

{¶38}  Under the facts of this case, the encounter was not a consensual encounter. Sanders was ordered to "stop." When asked the reasons, why he had to produce his identification, and whether he could leave, the deputy can be seen and heard on the body camera video telling Sanders he was being detained, and if he refused to identify himself, he could be charged with Obstruction. Nor, did the deputies have probable cause to believe Sanders, or Ms. Smith, had committed or was about to commit a crime.

{¶39}  In *State ex rel. Portage Lakes Edn. Assn., OEA/NEA v. State Emp. Relations Bd.,* 2002-Ohio-2839, ¶ 37, the Court observed,

>  "Probable cause" is normally referred to in the context of the commission of a crime and it is defined as "[a] reasonable ground to suspect

---

[3] The United States Supreme Court held that hat an incident search may not precede an arrest and serve as part of its justification. *Smith v. Ohio,* 494 U.S. 541, 543, 110 S.Ct. 1288, 1290, 108 L.Ed.2d 464 (1990). The Court further found that the defendant did not abandon the paper bag when he threw it on his car and turned to face the officer. Id. at 543, 110 S.Ct. 1288, 1290, 108 L.Ed.2d 464.

that a person has committed or is committing a crime." Black's Law Dictionary (7th Ed.1999) 1219; *see, also*, Webster's Third New Internatl. Dictionary (1971) 1806, defining "probable cause" as "a reasonable ground for supposing that a criminal charge is well-founded."

{¶40}  In *State v. Hawkins*,  2019-Ohio-4210, the Ohio Supreme Court observed,

"The Fourth Amendment permits brief investigative stops * * * when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014), *quoting United States v. Cortez*, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). This rule traces its beginning to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and therefore, the type of stop involved is referred to as a "*Terry* stop." In *Terry*, the United States Supreme Court "implicitly acknowledged the authority of the police to make a forcible stop of a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." (Emphasis deleted.) *United States v. Place*, 462 U.S. 696, 702, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

2019-Ohio-4210,  ¶19.  The Court contrasted "probable cause" with "reasonable suspicion,"

Precisely defining "reasonable suspicion" is not possible, and as such, the reasonable-suspicion standard is "'not readily, or even usefully, reduced to a neat set of legal rules.'" *Ornelas v. United States*, 517 U.S.

690, 695-696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), *quoting Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The reasonableness of a *Terry* stop "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The level of suspicion required to meet the reasonable-suspicion standard "is obviously less demanding than that for probable cause" and "is considerably less than proof of wrongdoing by a preponderance of the evidence" but is "something more than an 'inchoate and unparticularized suspicion or "hunch."'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), *quoting Terry* at 27, 88 S.Ct. 1868.

*State v. Hawkins*, 2019-Ohio-4210, ¶20.

To determine whether an officer had reasonable suspicion to conduct a *Terry* stop, the "totality of circumstances" must be considered and "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), *quoting Cortez* at 411, 101 S.Ct. 690.

"A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." Id. at 277, 122 S.Ct. 744. In permitting detentions based on reasonable suspicion, "*Terry* accepts the risk that officers may stop innocent people." *Illinois v. Wardlow*, 528 U.S. 119, 126, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

*State v. Hawkins*, 2019-Ohio-4210, ¶22.

**{¶41}** Upon review, under the totality of the circumstances, we conclude the deputies initiation of a brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, was reasonable in light of the facts known to the officer at the time. The body camera video entered into evidence during the suppression hearing clearly demonstrates that the deputy did not raise his voice, or become aggressive toward Sanders. The overhead cruiser lights were not activated, and the deputy attempted to calm Sanders' concerns by explaining to Sanders the reason he was investigating.

*Placing Sanders in the police cruiser*

**{¶42}** The deputies explained the reason for putting Sanders in the backseat of the cruiser was to separate him from the young lady as the deputies questioned each of them. In *State v. Durham*, the Court observed,

It is well-established that "[c]onfining an individual to the police cruiser is not a custodial placement if it is part of the investigation, even if the suspect in the police cruiser is not free to leave." *State v. Popp*, 12th Dist. Butler No. CA2010–05–128, 2011–Ohio–791, 2011 WL 646662, ¶ 20, quoting *In re M.D.*, 12th Dist. Madison No. CA2003–12–038, 2004–Ohio–

5904, 2004 WL 2505161, ¶ 18. Moreover, "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process ordinarily does not fall within the ambit of custodial interrogation." *State v. Rivera–Carrillo*, 12th Dist. Butler No. CA2001–03–054, 2002 WL 371950, *3 (Mar. 11, 2002).

2013–Ohio–4764, ¶ 23(12th Dist.); *State v. Taylor,* 2017-Ohio-4059, ¶30 (5th Dist.). I

{¶43} In the case at bar, Sanders was not told he was under arrest or handcuffed, and was merely asked if he had any weapons, not patted down, before being placed into the cruiser. The deputies observed digital scales, burnt foil, and had recovered a torch or butane lighter from Sanders. Further, the deputies observed what appeared to be a fictitious license plate on the car. Sanders was evasive when answering the deputies if he had been driving, if the female had been driving, and at least at first, who the car belonged too. Detaining Sanders while more information was gathered was not unreasonable under the circumstances.

{¶44} Upon review, under the totality of the circumstances, we conclude the events in the case sub judice constituted a reasonable *Terry* stop. We conclude the deputies placing Sanders in the police car in order to determine his identity, to facilitate questioning of the other individual, and to maintain the status quo momentarily while obtaining more information, was reasonable in light of the facts known to the officer at the time.

{¶45} Sanders' First Assignment of Error is denied.

II.

{¶46} In his Second Assignment of Error, Sanders argues that multiple acts were alleged in the Indictment in a single count of tampering with evidence. Specifically, Sanders was said to tamper with a key; while his co-defendant was alleged to tamper with suspected drugs. [Appellant's brief at 9]. Sanders contends that Crim. R. 31(A) required that there be two separate counts.

*Law and Analysis*

{¶47} "Duplicity in an indictment is the joinder of two or more separate offenses in a single count." *Parker v. Maxwell*, 174 Ohio St. 471, 471 (1963); Crim.R. 8(A) ("[t]wo or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense ..."). Thus, an indictment is duplicitous if it sets forth separate and distinct crimes in one count. *State v. Cass,* 2024-Ohio-2614, ¶ 58 (3rd Dist.).

{¶48} R.C. 2941.28 Misjoinder of parties or offenses, states,

*No indictment or information shall be* quashed, set aside, or *dismissed for any of the following defects***:**

(A) That there is a misjoinder of the parties accused;

(B) That there is a misjoinder of the offenses charged in the indictment or information, *or duplicity therein*;

(C) That any uncertainty exists therein.

If the court is of the opinion that either defect referred to in division (A) or (B) of this section exists in any indictment or information, it may sever such indictment or information into separate indictments or informations or into separate counts.

If the court is of the opinion that the defect referred to in division (C) of this section exists in the indictment or information, it may order the indictment or information amended to cure such defect, provided no change is made in the name or identity of the crime charged.

Emphasis added. Accordingly, dismissal of the indictment is not automatically an option when a defendant raises a challenge based upon duplicity.

**{¶49}** Sanders could have, but did not, seek to obtain more particularity with respect to the allegations contained in Count 1of the Indictment. Crim.R. 7(E) provides:

When the defendant makes a written request within twenty-one days after arraignment but not later than seven days before trial, or upon court order, the prosecuting attorney shall furnish the defendant with a bill of particulars setting up specifically the nature of the offense charge[d] and of the conduct of the defendant alleged to constitute the offense.

**{¶50}** *See also* R.C. 2941.07 ("Upon written request of the defendant made not later than five days prior to the date set for trial, or upon order of the court, the prosecuting attorney shall furnish a bill of particulars setting up specifically the nature of the offense charged and the conduct of the defendant which is alleged to constitute the offense"); *Morris v. Morris*, 2016-Ohio-5002, ¶30; *State v. Hayes,* 2022-Ohio-4473, ¶18. Providing a Bill of Particulars upon written request is mandatory. *Hayes,* ¶20. However, not every case requires a bill of particulars. Sometimes an indictment tells a defendant all the defendant needs to know to understand exactly what is alleged. In view of that (and the fact that constitutional rights are often waivable), a defendant is free to decide not to request a bill of particulars. Id. at ¶26.

**{¶51}** Sanders could suffer no prejudice in this case due to the wording of Count 1 of the Indictment. Sanders was tried separately from his co-defendant. Sanders was acutely aware that the state was alleging his act of secreting the car key in the police cruiser was the basis for the tampering charge. 1T. at 18. The trial judge noted his authority to separate Count 1 of the Indictment into two counts, one against each defendant. Id. at 19. The trial judge instructed the jury that Sanders' actions in locking the car doors and moving the car key from one location to another do not, in the absence of other evidence, raise a presumption of guilt. 3T. at 279. In addition, the jury found Sanders not guilty of the drug charges.

**{¶52}** Pursuant to Crim.R. 52(A), "any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." *See also, State v. McKnight*, 2005-Ohio–6046, ¶88 (applying non-constitutional harmless-error analysis to erroneous admission of other acts evidence).

**{¶53}** In order to sustain a conviction, a reviewing court must be able to declare a belief that the error is "harmless beyond a reasonable doubt, did not have an impact on the jury, or did not contribute to appellant's conviction in any meaningful degree." *State v. Rahman*, 23 Ohio St.3d 146,151(1986); *State v. Lytle*, 48 Ohio St.2d 391, 403 (1976); *State v. Anderson*, 2024-Ohio-3181, ¶ 73 (5th Dist.).

**{¶54}** We find beyond a reasonable doubt that the indictment was not duplicitous, and, even if it were, Sanders was informed of all he needed to know to understand exactly what was alleged. The result of the trial would have been the same had the Indictment specified separate counts for his actions and those of his co-defendant.

{¶55}  Accordingly, we find that the state has proven beyond a reasonable doubt that, in this specific case, the state's failure to separately state the allegations of Tampering with Evidence with respect to Sanders and his co-defendant was harmless beyond a reasonable doubt, did not have an impact on the jury, and did not contribute to Sanders' conviction in any meaningful degree.

{¶56}  Sanders Second Assignment of Error is denied.

{¶57}  The judgment of the Delaware County Court of Common Pleas is affirmed.

By Hess, V. J.,

Baldwin, P.J., and

Smith, V.J., concur